[No. 18075. *En Banc.* September 22, 1924.]

PACIFIC COAST ELEVATOR COMPANY, *Appellant,* v. THE
DEPARTMENT OF PUBLIC WORKS *et al.,*
*Respondents.*[1]

WAREHOUSEMEN—REGULATION OF RATES—FINDINGS OF DEPARTMENT
—REVIEW. Findings of the department on a hearing to fix reason-
able charges for warehousemen are entitled to the same presump-
tion of verity accorded to findings of a regular judicial tribunal,
even though the proceeding was instituted by charges preferred by
the department after contending parties had failed to come to any
agreement; and they will be sustained unless against the clear
weight of the evidence.

SAME—CHARGES—PROCEEDINGS TO ESTABLISH—VALUATION OF PROP-
ERTY—STATUTES. The department, in fixing permissible charges for
warehousemen, properly uses, as a rate making basis, the sums
prudently invested by the owners of the properties and the normal
amount of business transacted; and a schedule of rates based
thereon yielding slightly in excess of ten per cent on the invest-
ment, is proper, and it is not necessary to value the property at its
then market value.

SAME—CHARGES — PROCEEDINGS TO ESTABLISH — ALLOWANCE OF
WORKING CAPITAL. Error of the department in making an inade-
quate allowance for a sufficient working capital to be included in
the rate base for warehousemen's charges is not shown where there
was an actual allowance of one-sixth of its actual operating ex-
penses for the preceding year, to meet the first two months of the
seasonal operation, after which time, the receipts from operation
would meet the operating expenses.

SAME—CHARGES—PROCEEDINGS TO ESTABLISH—VALUATION OF NON-
OPERATING PROPERTIES. In fixing warehouse rates on the "prudent
investment" theory, warehouses that have not been used for five
years and that are out of repair should not be considered as part
of the investment of an operator in the locality in question.

SAME—CHARGES—PROCEEDINGS OF DEPARTMENT — VALUATION OF
PROPERTY—IMPROVEMENTS. Error in rates fixed for an individual
warehouseman with reference to improvements will not require a
reversal, on account of a possible mistake, which was recognized
by the department and jurisdiction retained for the purpose of
correcting it if injustice resulted.

[1]Reported in 228 Pac. 1022.

SAME—CHARGES—PROCEEDINGS OF DEPARTMENT — VALUATION OF PROPERTY—EFFECT OF ERROR IN FINDINGS. An error in fixing rates for warehousemen is not prejudicial as to a particular operator where he was allowed the same rates common to all operators in his situation and the error was distributed over the entire group and affects all alike.

SAME—CHARGES—REASONABLENESS OF RATES—EVIDENCE. Rates allowing warehousemen ten per cent on the amounts prudently invested are not confiscatory, although they are lower than those fixed by the operators' engineers, and there are many risks connected with the business.

SAME—CHARGES—ESTABLISHMENT OF RATES—POWERS OF DEPARTMENT — RETROACTIVE ORDERS — JURISDICTION. Rem. Comp. Stat., § 10434, authorizing the department to determine the amount and require repayment of overcharges by warehousemen, applies only to special cases for the recovery of overcharges, and does not authorize retroactive charges in proceedings to establish future charges.

SAME. The department, in fixing future charges may make an order retroactive if its effective date is subsequent to the time the department acquired jurisdiction.

Appeal from a judgment of the superior court for Thurston county, Wright, J., entered February 27, 1922, affirming an order of the department of public works fixing rates to be charged by warehousemen in the storage and handling of hay and grain, after a hearing to the court. Affirmed.

*C. Alex McCabe, W. A. Toner,* and *Wallace McCamant,* for appellant.

*The Attorney General* and *Raymond W. Clifford,* Assistant, for respondents.

FULLERTON, J.—On June 20, 1922, the department of public works of the state of Washington, on its own motion, filed before itself a complaint alleging, among other matters, that the existing charges for handling and storage of grain and hay, and the existing practices and regulations affecting such charges, made and

exacted by the public warehouses in the counties of Walla Walla, Columbia, Garfield and Asotin, "are in many instances excessive, unreasonable, discriminatory and unjust," and declared that,

"Wherefore, the department of public works of Washington will enter upon an investigation of such rates, charges, rules and practices, and after hearing or hearings will declare and order what shall be just and reasonable charges, or regulations to be imposed or enforced, particularly for the season of 1922; to inquire into the feasibility of substantial uniformity of charges and practices in such region, and make orders in relation thereto, and promulgate such other and further orders as the facts may warrant."

The cause was brought on for hearing at the city of Walla Walla on August 31, 1922, of which due and timely notice was given. At this hearing certain evidence was taken, whereupon the hearing was adjourned until October 22, 1922, at which time further evidence was taken. Thereafter the department made its findings and conclusions, and on November 10, 1922, entered a general order determining and fixing the rates and charges permissible to be charged by the owners and operators of warehouses within the territory described.

The order is as follows:

"Wherefore, it is ordered, that the operators hereinafter named, post in a conspicuous place in their respective warehouses and mail to this department within fifteen days from the date of the service of this order, a schedule of rates and charges applicable to the 1922 crop, effective as of July 1, 1922, as follows:

"A handling charge of $1.00 per ton which charge shall include storage up to the first day of January, 1923.

"An additional fifty cents per ton for loading out in bulk.

"Storage ten cents per ton per month, or major fraction thereof, after January 1, 1923.

"The actual expense of resacking grain when such expense is necessary.

"A weighing out charge of ten cents per ton when reweighing is demanded by shipper.

"To-wit:

"The Pacific Coast Elevator Company as to the following warehouses:

| | | |
|---|---|---|
| Riffle | Climax | Touchet |
| Minnick | Paddock | Dry Creek |
| Eastman | Shaw | Eureka |
| Dixie | Ennis | Sudbury |
| Tracy | Alto | Lamar |
| Harbert | Valley Grove | Prescott |
| Rulo | Whitman | Pomeroy |
| Thiel | Lowden | Pedigo |
| Drum | | |

"Interior Warehouse Company as to the following warehouses:

Lamar          Dayton

"Northwestern Dock and Elevator Company as to the following warehouse:

Thiel

Albert Guntley........................Welland
Prescott Warehouse Company..........Prescott
Pomeroy Farmers Union Warehouse....Pomeroy
Hervie M. Tidwell....................Pomeroy
N. C. Donaldson......................Pomeroy
F. M. Robinson.......................Pomeroy
Peder J. Bue.........................Pomeroy

"It is further ordered, that the following named operators shall post in their respective warehouses and file with the department not later than May 15, 1923, effective July 1, 1923, the following rates and charges applicable to the 1923 crop and following crops until the further order of this department:

"A handling charge of seventy-five cents per ton.

"An additional fifty cents per ton for loading out in bulk.

"Storage charges after thirty days, ten cents per ton per month.

"A charge for the actual expense of resacking grain when necessary.

"No charge for reweighing grain at time of shipping out.

"The operators required to file the above schedule of rates and the warehouses to which same shall apply are as follows:

"Pacific Coast Elevator Company:

| | | |
|---|---|---|
| Riffle | Climax | Touchet |
| Minnick | Paddock | Dry Creek |
| Eastman | Shaw | Eureka |
| Dixie | Ennis | Sudbury |
| Tracy | Alto | Lamar |
| Harbert | Valley Grove | Prescott |
| Rulo | Whitman | Pomeroy |
| Thiel | Lowden | Pedigo |
| Drum | | |

Interior Warehouse Company............Lamar
Interior Warehouse Company...........Dayton
Paul and Nat Webb.................Berryman
Hadley Warehouse Company............Hadley
Northwestern Dock and Elevator Co.......Thiel
Jones-Scott ......................Walla Walla
Jones-Scott ..........................Russells
Stanfield Grain and Warehouse Co.......Sapolil
Albert Guntley........................Welland
Walla Walla Farm Agency.........Walla Walla
Walla Walla Farm Agency...............Dixie
Walla Walla River Warehouse Co...Walla Walla River
Preston Shaffer Milling Company....Waitsburg
Waitsburg Farmers Union Warehouse Company.
As to all stations operated by said company.
Turner Younger Warehouse Company...Turner
Turner Younger Warehouse Company...Dayton
Turner Younger Warehouse Company.Whetstone
Prescott Warehouse Company.........Prescott
E. N. McCaw........................Prescott

Bolles Junction Warehouse Company..........
............................... Bolles Junction
Owsley and Case .......................Coppei
Mrs. S. J. Corbett...................Huntsville
Homer E. Price.....................Huntsville
Whetstone Turner Warehouse Company........
As to all stations operated by said company.
Portland Flouring Mills ......................
As to all stations operated by said company.
Pomeroy Farmers Union Warehouse Company..
................................... Pomeroy
N. C. Donaldson.......................Pomeroy
Hervie M. Tidwell....................Pomeroy
F. M. Robinson.......................Pomeroy
Peder J. Bue.........................Pomeroy
Farmers Warehouse Association.........Asotin
O. H. Woodward......................Dayton
Davis Mill ..................................
As to all stations operated by said company.
John A. Cameron...................Walla Walla

"And it is further ordered that the rates and charges of the following warehouse operators at the locations designated below be not changed or disturbed by this order:

| Operator | Location |
|---|---|
| Pacific Coast Elevator Company | Magallon |
| Pacific Coast Elevator Company | Walker |
| Pacific Coast Elevator Company | Sheffler |
| Pacific Coast Elevator Company | Mathews |
| Pacific Coast Elevator Company | Clyde |
| Pacific Coast Elevator Company | Judkins |
| Ilia Warehouse Company | Ilia |
| O. A. Beckwith | Rice's Bar |
| A. T. Longgood | Starbuck |
| A. T. Longgood | Powers Station |
| A. T. Longgood | Relief |
| J. R. Stanfill | Silcott |
| Earl and Roup Brothers | Couse Creek |
| Clyde Warehouse Company | Clyde |
| Pleasant View Warehouse—A. T. Longgood | Pleasant View |

P. V. Elevator Company.........Pleasant View
J. L. Jackson..................Jackson Siding
Turner Younger Warehouse Company..Delaney

"And it is further ordered, that Charles Dodge and E. E. Knettle, and each of them, shall post in their respective warehouses at Dodge and Zumwalt, and file with the department within fifteen days from the date of the service of this order, the following rates and charges applicable to the 1922 crop, effective as of July 1, 1922:

"A handling charge of $1.25 per ton, which charge shall include storage up to the first day of January, 1923.

"An additional charge of fifty cents per ton for loading out in bulk.

"A storage charge of ten cents per ton per month, or major fraction thereof after January 1, 1923.

"The actual expense of resacking grain when such expense is necessary.

"A weighing out charge of ten cents per ton when reweighing is demanded by the shipper.

"And it is further ordered, that said Charles Dodge and E. E. Knettle, and each of them shall post in their respective warehouses at Dodge Station and Zumwalt, and file with this department not later than May 15, 1923, the following rates and charges, effective July 1, 1923:

"A handling charge of $1.00 per ton.

"Storage after thirty days of ten cents per ton per month or major fraction thereof.

"An additional charge of fifty cents per ton for loading out in bulk.

"The actual expense of resacking grain when such expense is necessary.

"No weighing out charge.

"And it is further ordered that the R. L. Young Warehouse, or its operator, shall post in said warehouse at Central Ferry, and file with the department within fifteen days from the date of the service of this order, the following rates and charges applicable to the 1922 crop, effective as of July 1, 1922:

"A handling charge of $1.50 per ton, which charge shall include storage up to the first day of January, 1923.

"An additional charge of fifty cents per ton for loading out in bulk.

"A storage charge of ten cents per ton per month, or major fraction thereof after January 1, 1923.

"The actual expense of resacking grain when such expense is necessary.

"A weighing out charge of fifteen cents per ton when reweighing is demanded by the shipper.

"And it is further ordered, that R. L. Young, operating the R. L. Young Warehouse at Central Ferry, shall post in said warehouse, and file with the department not later than May 15, 1923, the following rates and charges, effective July 1, 1923:

"A handling charge of not to exceed $1.50 per ton, which charge shall include storage up to January 1st following.

"An additional charge of fifty cents per ton for loading out in bulk.

"A storage charge of ten cents per ton per month, or major fraction thereof, after January 1st.

"The actual expense of resacking grain when such expense is necessary.

"No weighing out charge.

"And it is further ordered, that the Pacific Coast Elevator Company, at its Mayview Tramway, shall post in its warehouse, and in its receiving yard at the head of said tramway and file with this department within fifteen days from the date of the service of this order, the following rates and charges applicable to the 1922 crop, effective as of July 1, 1922:

"A handling charge of $1.75 per ton, which charge shall include storage up to the 1st of January, 1923.

"An additional charge of fifty cents per ton for loading out in bulk.

"A storage charge of ten cents per ton per month, or fraction thereof, after January 1, 1923.

"The actual expense of resacking grain when such expense is necessary.

"A weighing out charge of fifteen cents per ton when reweighing is demanded by the shipper.

"And it is further ordered, that the Pacific Coast Elevator Company, at its Mayview Tramway, shall post in its warehouse, and in its receiving yard at the head of said tramway and file with this department not later than May 15, 1923, the following rates and charges, effective July 1, 1923:

"A handling charge of $1.50 per ton, which charge shall include storage up to the first day of January following.

"An additional charge of fifty cents per ton for loading out in bulk.

"A storage charge of ten cents per ton per month, or major fraction thereof after January 1st.

"The actual expense of resacking grain when such expense is necessary. (To apply to grain only after delivery to the warehouse.)

"No weighing out charge.

"And it is further ordered, that the department retain jurisdiction for the purpose of granting relief where, by reason of unusual conditions, competitive or otherwise, any provision of this order may work injustice or undue hardship, upon timely petition to this department for such relief.

"And it is further ordered, that in so far as previous orders entered by this department in the cases affecting N. C. Donaldson Warehouse, the J. O. Long or H. M. Tidwell, and the E. E. Knettle Warehouses may conflict with this order the same are hereby modified to conform to the provisions of this order.

"The various operators will be expected to refund any amounts collected in relation to the 1922 crop in excess of the amounts prescribed in this order. All such payments, however, should be refunded through the department of public works in conformity with Chapter 110 of the Laws of 1921. Any such refunds shall be paid to the Department of Public Works to be disbursed by it in conformity with such statute."

All of the warehouse operators, other than the Pacific Coast Elevator Company, complied with the order of the department, making a refund to that body, as shown by a supplemental transcript, of all charges in excess of those permitted under the order.   The company named brought proceedings seeking a review of the order in the superior court of Thurston county. That court, on the hearing, affirmed the order of the department, and from its judgment the present appeal is prosecuted.

As a preliminary to its principal arguments, the appellant makes the contention that the courts cannot accord to the findings and conclusions of a rate-making body the same presumption of fairness that is accorded to the findings and conclusions of a more regular judicial tribunal.   It is argued that it has the powers of both a prosecutor and of a judge, and in the instant case it calls attention to the fact that the complaint on which the inquiry is founded was filed by the tribunal itself.   There is authority elsewhere supporting this argument (*Public Service Gas Co. v. Board of Public Service Utility Com'rs*, 84 N. J. Law 463, 87 Atl. 651), but it is not in accord with our hitherto expressed views on the question.   A similar charge was made in the comparatively early case of *State ex rel. Oregon R. & Nav. Co. v. Railroad Comm.*, 52 Wash. 17, 100 Pac. 179, concerning which we said:

"It is insisted that, inasmuch as the commission makes out the complaint, the commission is an accuser, and it is treated by the arguments of counsel as a tribunal in opposition to the just interests of the railroad companies.   This court cannot act on such an assumption.   The commission was provided for not for the purpose of interfering with any just and legal rights of the railroad companies or other corporations, but as a mediatory court standing between the private

interests of the country and the interests of the carriers; and the fact that the complaint in response to petitions is made by the commission formally is not such a fact as would warrant the assumption or suspicion that the commission was not acting justly and impartially.    .    .    .    We think, on the contrary, the presumption must be that the commission will act with fairness towards all parties.''

In *State ex rel. Seattle v. Public Service Comm.*, 103 Wash. 72, 173 Pac. 737, we quoted and adopted the following expressions of the learned trial judge sitting as the court of primary review of the order of the commission:

'' 'The findings and conclusions of the commission as to the facts are invested with the presumption of verity and no court would undertake to disturb them in this case.   Respect is accorded to the judgment of those in whom the people by their own plan have placed it.' ''

In the case of *In re Sherril,* 116 Wash. 143, 198 Pac. 725, speaking of a similar charge made against the state board of law examiners, we said:

''The complaint was verified by a member of the board to the effect that he believed it to be true.    It is argued that this is to make the board both the accuser and the judge, and that the proceedings are void for this reason.   But this is a power expressly conferred on the board by the statute, and no presumption of unfairness or partiality arises from the fact.''

In this instance, however, the action of the department was not voluntary in the sense that complaints of overcharges by the warehouse companies involved originated in the department.   The record shows that, for a long time prior to any action taken by that body, numerous complaints were made to it of over and excessive charges by grain growers who were compelled to patronize the warehouse companies in marketing

their products. Nor was the department guilty of ill-considered or hasty action when these complaints became so numerous as to require some form of action. It first sought to have the matters adjusted by a mutual agreement of the parties concerned. To that end it called a meeting of the warehousemen and grain growers, of which both personal and public notice was given, and which was numerously attended, and sought to have the parties interested agree among themselves on handling and storage rates. It was only after the parties failed to reach an agreement that the formal complaint was filed.

Moreover, we think the provision of the law permitting the department itself to file the formal complaint is a wise rather than an unwise provision. It enables the department to so frame the issues as to embody in one hearing all of the grievances of which informal complaint is made and to see that proper notice is given to the interested parties, which might not be so were it permitted to act only on the complaint filed and notice given by a private individual or an association of individuals. In so far as the department is concerned, therefore, the complaint is nothing more than the formal statement of the issues to be determined, and we cannot think that the fact that it files it as upon its own motion in anywise imputes to it a prejudging of the issues, or in any sense puts it in the position of a prosecutor. Its findings and conclusions should, therefore, be given the weight accorded to any impartial tribunal, and should be overturned only when the clear weight of the evidence is against its conclusion, or when it mistakes the law applicable to the matters adjudicated by it. *State ex rel. Great Northern R. Co. v. Railroad Comm.*, 60 Wash. 218, 110 Pac. 1075; *Puget*

*Sound Elec. Railway v. Railroad Comm.*, 65 Wash. 75, 117 Pac. 739, Ann. Cas. 1913B 763.

The first of the questions in controversy is whether the department, in ascertaining the values of the several properties involved, on which it based its schedule of permissible charges, pursued a proper method of valuation. The method adopted by the department is what is commonly termed the prudent investment method. The department ascertained the sums of money prudently invested by the owners in the properties, and, using the sums so found as a rate base, formulated a schedule of charges which, based on the normal amount of business transacted, would yield to the owner a sum slightly in excess of ten per centum on the investment. The method pursued by the department was the method which we approved in *State ex rel. Spokane v. Kuykendall,* 119 Wash. 107, 205 Pac. 3. We there pointed out that this was not only the method of ascertaining the value of property for rate making purposes uniformly pursued by the department in its former practices, but was the method required by the statute under which the department derived its powers.

The appellant contends, however, that this method of valuation violates the fourteenth amendment to the constitution of the United States; that the rule under that amendment requires that property be valued for rate-making purposes as of the time when the inquiry is made, and must be taken at its then market value as a going concern. A number of cases are cited from the supreme court of the United States as maintaining the rule, three of which, namely, *Southwestern Bell Tel. Co., v. Public Service Comm.,* 262 U. S. 276; *Georgia R. & P. Co. v. Railroad Comm.,* 262 U. S. 625; and *Bluefield Water Wks. & Imp. Co. v. Public Serv-*

*ice Comm. etc.*, 262 U. S. 679, were determined since
the determination of our case of *State ex rel. Spokane
v. Kuykendall, supra.* There is, however, a distinc-
tion between the cited cases and our own case. In the
cited cases the statutes governing the regulatory
bodies did not prescribe the rules by which the prop-
erty of the utilities under consideration was to be val-
ued, and the regulatory bodies and the courts were
left free to adopt such a rule of valuation as would
best accord with the justice of the case. In this state,
as we have shown, the statute has not left the depart-
ment or the courts free in this respect. It has in itself
prescribed the rule. Whether this difference will be
regarded by the authoritative court as a sufficient justi-
fication for the rule so adopted remains yet for deter-
mination. But until it is so determined we feel con-
strained to follow the statute. To do otherwise would
not only require the overturning of the statute, but it
would possibly undo and render nugatory many of the
orders the department has made in cases of a like
nature.

The second contention is that the department, while
conceding that a sufficient working capital should be
included as a part of the rate base, made an inadequate
allowance for that purpose. In its general summary
of the valuations found, language is used which would
indicate that but a comparatively small sum was so
allowed. But the language is misleading. From the
findings elsewhere, and from the statement of values
as reported by the department's engineers, it is made
clear that the actual allowance made to each several
warehouse and added to the rate base was one-sixth of
its actual operating expense for the preceding year,
and that there was in addition a special allowance for
certain warehouses because of their situation. This

was estimated by the department as sufficient to meet the operating expenses for the first two months of the seasonal operation, after which time, it was further found, the receipts from operation would meet the operating expenses. There was testimony on the part of the operators that much larger sums were required for the purpose. But their testimony was in the nature of estimates. No actual figures were produced, and from the latitude the witnesses allowed to themselves, it is inferable that the estimates were but little more than wild guesses. We cannot conclude, therefore, that there was error in this regard.

The following appears in the findings of the department:

"There are some localities where more warehouses have been built than public necessity and convenience demand, with the result that the investment upon which earnings are required to be computed is larger than necessary. In the absence of a certificate of convenience and necessity law, giving our department some power to prevent needless duplication of public utility properties, the rate base and consequently the rates will in some instances be higher than if needless duplications were prevented.

"However, we believe that every community should have sufficient warehouse space to care for a maximum crop and growers should be willing to pay a reasonable earning on a sufficient investment to provide such space. A small amount of grain damaged by the elements for want of warehousing will pay storage on many tons."

The department, however, applied the rule only to warehouses it found in operation. The appellant owned two warehouses which were not being operated at the time of the hearing, nor had they been so within five years preceding that time. Neither of them were in such a state of repair as to admit of operation, al-

though the manager testified they were capable of being put in condition, and would be so put should a demand for their use arise. The appellant argues that their property should be treated as a whole in so far as the district covered by the inquiry is concerned, and that the department erred in refusing to take the value of these properties into consideration when formulating a rate base. But if the prudent investment theory be the correct basis for measuring the permissible return, plainly the department was right in excluding these warehouses. They have been idle long enough to raise a reasonable presumption that the investment in them was not prudent, and the evidence, in so far as it bears on the question, indicates that there is no immediate prospect that their use will be further required —that the competition of more favorably situated warehouses has destroyed their value.

The appellant owns a warehouse property situated at a place called Mayview. This property consists of certain buildings on the highlands at the top of the Snake river canyon, a tramway, approximately one and one-half miles long, leading therefrom to the bottom of the canyon, and a warehouse on the bank of the river at the foot of the tramway. Grain for storage is received from the producers at the buildings first mentioned, from whence it is carried over the tramway to the warehouse. In estimating the value of this property, the department used as part of the base a valuation made of the property some years before, adding thereto the value of the improvements made to the property subsequent to the valuation. The appellant objects to this on two grounds; first, because the order was not made a part of the record, and second, because the owner was not represented at the time the valuation was made. But we think these objections must

be based upon a misapprehension of the state of the
record. We find in the record a copy of the order in-
troduced as "Exhibit No. 5," and the order recites on
its face that at the hearing the then owner appeared
in person. As a result of this hearing, certain im-
provements on the property were required to be made,
and the schedule of charges was increased over those
then prevailing. The appellant acquired the prop-
erty, it is true, subsequent to this hearing, but the de-
partment made inquiry as to the value of the better-
ments made to the property by the appellant since it
acquired the ownership, and added these values to the
values found at the prior hearing in formulating a
rate base. Error can be found in the department's
action, we think, only on the theory that the present
worth of the property represents its value for rate-
making purposes, rather than the prudent investment
in the property.

There was, however, a mistake made by the depart-
ment with reference to this property in calculating
the rate base. It is stated that the valuation placed
on the property at the earlier valuation was $1,200,
and that the plant additions made since that time,
"plus an allowance for working capital on the basis
heretofore indicated, brought the rate base up to
$17,240." The earlier valuation, as shown by the ex-
hibit mentioned, was $16,083, thus indicating that the
valuation was $4,083 less than the department intended
to make it. Elsewhere in the record, however, the true
amount is stated, and the somewhat indefinite finding
is susceptible of the conclusion that the error may be
clerical rather than one of substance. We cannot think,
therefore, that the possibility of error requires a re-
casting of the account. Especially so, since the depart-
ment itself recognized the possibility that its order

might in individual cases work injustice or hardship and retained jurisdiction over the case for the purpose of correcting it in all such instances. Should it be subsequently shown that the rates fixed do not produce the net return on this property contemplated in the order, the appellant has liberty to apply to the department for relief.

There is a mistake, arising apparently from an error in multiplication, in the valuation of the appellant's warehouse located at Minnick, which lessens by some four thousand dollars the total valuation as found by the department. The error, however, is not of sufficient moment to affect the ultimate result. It has no special bearing on the rate of return from the particular warehouse, as it was allowed the schedule of rates common to all warehouses in its situation. (See the second group of warehouses in the department's order before quoted.) The error is thus distributed over the entire group, and affects the appellant in no greater degree than it affects all other owners of warehouses involved in the inquiry. If our calculations are correct, it will not reduce the rate of return below the ten per centum the department sought to allow.

The appellant further complains that the valuations placed by the department upon its properties located in the Pomeroy group are substantially less than the valuations placed thereon by its own engineers. A table is submitted in the brief to demonstrate the statement. We notice, however, that the table includes a warehouse not included in the tables of the engineers, and which was placed by them and by the department in another group. With this one eliminated we do not find the discrepancy claimed.

Complaint is made that the rate of return permitted by the department is inadequate. It is indeed below

the estimates made by the warehouse operators. Their testimony is to the effect that there are many risks involved in the storage and handling of commodities of the sort here in question, and that a somewhat higher rate of return than is normally exacted for the use of money is necessary to induce capital to invest in the enterprise. But the question involved when it reaches the courts is whether the rate of return permitted is confiscatory. As we have shown, the rate of return sought to be established by the department is ten per centum on the sums prudently invested in the properties. We cannot hold that this is confiscatory.

The proceedings were instituted before the department on June 20, 1922. The final order therein was entered on November 20, 1922, and was made effective as of the date of July 1, 1922. It is contended by the appellant that the order is retroactive, and that such an order is beyond the powers of the department unless the statute specially authorizes such an order, and that we have no such statute. With respect to the contention in so far as it relates to the want of a statute, we agree. Counsel representing the department point to § 10434, Rem. Comp. Stat. [P. C. § 5618-1], as furnishing such authority. The statute cited reads as follows:

"The director of public works shall have power and it shall be his duty, upon complaint in writing being made to him, to determine the amount of overcharge made and refund due in all cases where any public service company, as defined in this chapter, charges an amount for any service rendered in excess of the lawful rate in force at the time such charge was made, or which may thereafter be declared to be the legal rate which should have been applied to the service rendered, and to determine to whom the overcharge should be paid: Provided, that this act shall not apply

to controversies arising in relation to contracts in existence prior to the taking effect of this chapter.''

But this provision, we think, is applicable only to the special case where recovery is sought for an overcharge made in a specific transaction, and is not applicable to a proceeding brought primarily to establish a future rate. That there is an essential distinction between the two proceedings is at once apparent. This distinction was pointed out by the supreme court of the United States in *Baer Bros. Merc. Co. v. Denver & R. G. R. Co.*, 233 U. S. 479, wherein the court said:

''That the two subjects of Reparation and Rates may be dealt with in one order is undoubtedly true. *Texas & Pac. Ry. v. Abilene*, 204 U. S. 426, 446. *Robinson v. Balt. & Ohio R. R.*, 222 U. S. 506, 509. But awarding reparation for the past and fixing rates for the future involve the determination of matters essentially different. One is in its nature private and the other public. One is made by the Commission in its *quasi*-judicial capacity to measure past injuries sustained by a private shipper; the other, in its *quasi*-legislative capacity, to prevent future injury to the public.''

On the question whether a rate-making body has authority in virtue of its general powers to make its order effective as of a time antedating the institution of the proceedings, there is a dearth of authority. In so far as they have been brought to our attention, the trend is in the direction of the absence of such power. It was so held by the Ohio Public Utilities Commission (Public Utilities Reports, 1921 E, p. 733), and the Oregon Public Service Commission held to the same effect, basing its holding on the advice of the attorney general of the state. Public Utilities Reports 1290 B, p. 199. No decision of a court passing upon the question has been pointed out to us.

But the question before the commissions referred to is hardly the question now before us. In the cited instances, the commissions were considering the question whether they could make an order retroactive in the sense that its effective date should antedate the time jurisdiction was acquired over the subject-matter of the controversy, while in the present case the department did not attempt to do so. The effective date of the order, while prior to the date of the entry of the order, is subsequent to the time the department acquired jurisdiction. It would seem that this difference should make a difference in the rule. It was so held in *Boston and Worcester Railroad Corp. v. Western Railroad Corp.*, 14 Gray (Mass.) 253. In that case a commission exercising powers similar to the powers conferred on the department in this instance, made its order effective as of a date prior to the time it acquired jurisdiction. The court held that this was beyond its powers; that their determination could only take effect from and after the institution of the proceedings, and allowed the order to stand as effective from that time, although the time ante-dated the time of the actual entry of the order; the court saying:

"It is however further objected by the Western Railroad Corporation, that the commissioners exceeded their powers in determining that their award should relate back to the first day of June, 1856, being the date of the expiration of a former contract between the parties. This objection must be sustained. Their determination could only take effect from and after the time of the filing of the petition of the Western Railroad Corporation. So much, therefore, of the award as relates to the rights, duties and obligations of the parties anterior to the commencement of proceedings, by the filing of that petition, must be set aside and rejected. This in no way affects the award in any other respect; and the order therefore must be

that, with that exception, it is accepted, affirmed and established, and that judgment to this effect be entered of record.''

On principle, the rule would seem to be sound. The wrong sought to be corrected was then existent. The powers of the department in such matters are legislative rather than judicial, and its powers were as potent from the time it acquired jurisdiction as they were at any subsequent time. We hold, therefore, that the order was not in this respect in excess of power.

The judgment of the trial court will stand affirmed. All concur.